Good morning. May it please the Court. Alexander T. Can I just ask one thing for both the parties? We are aware that we have a motion from Churchill about substituting. We will deal with that when we get Churchill up here to talk about that. But we know it's out there, okay? Okay. Thank you, Your Honor. Please proceed. Alexander T. Tiesky for the Plaintiff Appellant, Cheryl Kater. I'd like to take three minutes for a rebuttal if I can. Okay. We'll try to help you. So this is a straightforward statutory interpretation case, and so I think it's most effective to So I don't think there's any question that Washington law allows plaintiffs to recoup gambling losses from the proprietor of a gambling game. And so the only outstanding question is whether these casino chips in Churchill Downs' online casino game are things of value under Washington law, right? Because if what you bet is a thing of value and what you win in a game is a thing of value, then the game is gambling and you can recoup your losses. So the statute here, it's RCW 946-0285, gives three categories of things of value. Two of the categories are relevant here. I'd like to focus on the third category, which is any form of credit or promise, directly or indirectly, contemplating transfer of money or property, or of any interest therein, or involving extension of a service, entertainment, or privilege of playing at a game or scheme without charge. So the casino chips here, they meet that definition. Well, let me ask a couple questions. Doesn't the fact that the statute was drafted in 1973, before we had computers or the internet, make this application of the statute just inherently ambiguous? I don't think so, Your Honor. And the reason I don't think that is even before computers, people have been doing this for a long time. The bullseye case, which is from the 70s, is a really good example of this. In the bullseye case, you could get free points to play this, a game that looks a lot like this. It's not on the internet, but it's a machine. And the Washington Court of Appeals said there, look, even though they give away the, in that game they were called play points, right? Even though they give away these play points that have no pecuniary value, even though they give them away for free, if you win more, then you get to continue playing this game. You can also pay them. You can put a dollar into the machine. And that's enough to call it a thing of value. So I don't think, you know, the online nature of this specifically makes sure that we know that it's illegal, because in Washington State, all online gambling is illegal. So there's no question about that. The word illegal is in the statute, so it must be illegal for you to recover. Is there a way to read the statute so that things of value can be defined to mean either any money or property or any token, object, or article exchangeable for either money or property or any form of credit or promise, contemplating transfer of money or property or involving the extension of a service, entertainment, or privilege of playing the game or scheme without charge, modifying what is exchangeable instead of what is the thing of value? Modifying. I think that that would make language in the statute duplicative. So the reason we have it parsed out in our brief to be these three categories separated by the disjunctive order, the reason for that is because the second one has exchangeable for money or property, and then the third section has contemplating transfer of money or property. It would seem strange to me to have exchangeable for money or property modified by something that says contemplating transfer of money or property, right? Those, you can't, both of those things together don't, they don't make sense read in conjunction. I think they have to be read as three different categories. Or contemplating transfer of money or property would, I'm sorry, would be sort of describing any form of credit or promise. Right. So the last category we have is any form of credit or promise directly or indirectly, and then the rest of those, the rest of those definitions, they're modified. So it's either any form of credit or promise that contemplates transfer of money or property, or it's any form of credit or promise involving extension of a service, entertainment, or privilege of playing at a game. I think that's the only way you can read it, because there's no other noun that involving extension of a service, entertainment, could modify. And that's how the court, the Washington Court of Appeals read it in bullseye. They said, look, you know, these, these credits in this game extend you the privilege of playing this game without charge, and that's enough. You know, we don't have to look at, at pecuniary value to figure out, to figure out, or a transfer of money or property or any of those to, to figure out that these fall under the statutory definition here. Bullseye is your best, your best argument, is it not? Specifically that it, the, this game extends the privilege of playing without charge. Yes. I mean, I, I would base that in the statute as opposed to in the, in the case, but, but yes. The case interprets it that way. Yes. That's certainly our best argument. And I should add that, that that case interprets it in terms of consideration. Much of the focus on the district court's opinion and in my friend's briefing was on the, what they called a prize element. They're, they're one and the same here, but the statute refers to them as the same way, this thing of value. And I should add that the statute doesn't say the word prize in it, right? It says receive something of value in the event of a certain outcome. And so that's the same idea as the consideration in bullseye. It's, it's, is the thing, a thing of value. And, and as, as Your Honor said in that third definition, it's certainly our best argument that it is. And that, in this case, that is essentially what happened, right? Yes. That is absolutely what happened. You, you know, they give you a, you know, they throw you a few free chips to start. You know, there's a lot of discussion about free to play. Bullseye also discussed that just because they throw you a few free ones doesn't mean they're not things of value. You run out of those real fast. And then you have to. And if you want to continue to play, you've got to buy something. Yeah. You've got to, you have to, you have to put in a lot of money. Our client, our allegation is $200. She spent significantly more than that, orders of magnitude more. People get addicted to this. And, you know, they make, they make an awful lot of money, I think, you know, millions and millions of dollars. But where, when, when your client paid this additional money, where did it go? Does the record show? I mean, you know, so it's bought through the app. So it goes to, we allege that it goes to Churchill Downs, the proprietor of the game. Okay. So, so Churchill Downs owns the app and any money that would be paid through the app would go to Churchill Downs. Does the record show that? I mean, the, the complaint alleges that Churchill Downs got the money. You know, we don't know specifically where it goes. I know that, I know that Apple probably takes a cut, but, but as far as the allegations are concerned, it goes to the defendant. And Churchill Downs is the only defendant named here. So they're, they're the ones who are getting the money, ultimately. Do you have anything in the record that indicates how the app was developed or anything underlying it, what its purpose was other than to make money? That's its purpose, to make money. We, we don't, we don't have any, any allegations about the development. We know that Churchill, you know, Big Fish was an independent company. Churchill Downs bought it. So they're, you know, they're the proprietor of the game under the statute. It's not a, it's not a game designed to encourage the gambling instinct, like a dentist giving kids bubblegum kind of thing. Oh, I mean, we certainly, it certainly is. And there are allegations to that effect that, that they know that gambling is addictive. Look, the Churchill Downs is a gambling company, right? They run, they run tons of casinos. They know how this works. And so certainly, certainly we allege that that's, that that's what it's, that that's what it's for. Is there any evidence in the record indicating how much money, not just with your client, but how much money Churchill Downs has made from using this app in the state of Washington? Well, I should, to start, this actually would be a nationwide, because there's a Washington choice of law clause. Okay. Do you have any evidence about that? It is, it is millions and millions of dollars. You know, we haven't put in any evidence of anything because this is on a motion to dismiss. But it's certain, nobody, nobody's contested that it's more than $5 million. That's, that's what I know. You know, what I also know is that. I tend to show that, in fact, it wasn't just free chips. There was an understanding that money would be made, you were going to buy more chips and that money would be paid to Churchill Downs and they would make a lot of money. In this case, more than $5 million. Absolutely, Your Honor. And they sold it. You know, I think we allege how much they bought it for. And they've put in their moving papers how much they sold it for. They made hundreds of millions of dollars when they decided to get out of this business and sell this game. It's very, very profitable. You know, I don't think there can be, there could be any question about that. You know, this is a huge money-making enterprise for them. You know, as I said, millions of dollars, individuals spending tens of thousands of dollars on these chips. Because it is addictive, unquestionably. Well, what about the terms of use? Didn't the plaintiff agree to the terms of use and wouldn't it be a violation of the terms of use? So, I think what Your Honor is referring to is our argument with regard to the secondary market. So, it might violate the terms of use to sell on the secondary market. What that secondary market shows is, it's just another way to show thing of value. It's to show that they are exchangeable for money or property. And this is kind of a wink. The terms of use would prohibit that. They would, except that, you know, Churchill Downs says, the terms of use prohibit it and we, you know, take every effort to shut it down. And they also say that it doesn't happen and they don't make any money on it. Our allegations are that they, in fact, facilitate transferring these chips between people and that they make money doing it, that they take a cut when you transfer chips between people. So they know about it. They make money on it. It's a wink and a nudge arrangement. But it's not necessary, you know, to even reach that question as far as our case is concerned. Because what you're asking is, are these things a thing of value under the statute? Look, there's lots of things that have value that are either illegal or contractually illegal to transfer. Drugs are a great example. Drugs have no value. They all belong to the government, right? But they are, there's a street value of drugs. Are you dropping that contractual argument that, notwithstanding what the language says, that if people sell these things, they're violating the contract and, but you're saying, don't go there. We don't need to, right? We're not necessarily dropping that argument. I mean, it's just, if the court has concerns about it, there's an easy way around it, which is, which is that, that third portion of the statute. But you know, if the court is more interested in the, in that sort of second portion of the statute and the, the exchangeable for money argument, then, then the answer is yes, the terms of service say that. No, it doesn't matter. Because all that it's demonstrating, you know, it's not that she tried to use the secondary market or anything like that. But it's just demonstrating that they have value, that Churchill Downs has contemplated that these things can be trans, can be exchanged for money. That's, that's the, that's the kind of key point with that. I'd also like to address the materials from the State Gambling Commission. So there was a motion, a request for judicial notice. Those documents shouldn't inform the court's decision here. I believe, I don't believe we've ruled on that, but. No, it was taken with the case, I believe. But I'm saying it shouldn't inform the court's decision if, if we found that this language was ambiguous, wouldn't it be relevant to know what the Gambling Commission, we're talking about the same documents, I'm not. Yes. So the pamphlet and the slide deck. It would absolutely be relevant if the Gambling Commission had issued any kind of interpretive statement, which in Washington has to be marked as an interpretive statement and has to be the opinion of the commission. That's not what this is. There's a slide deck that was presented at a meeting that the Gambling Commission, members of the commission openly questioned the conclusions of it. There was no vote to adopt it. This isn't the opinion of the, of the appointed board of Washington. It's a few employees at a commission, at the commission who gave a presentation as to what they thought. The pamphlet in the lobby too, you know, it's, it's just, it's just a pamphlet that's been drawn up by the employees and it misstates the law, frankly. Was it presented at district court? It was raised in the district court and the district judge did not consider it. And I think that, that that was a correct decision by the district court. This court shouldn't, shouldn't look at that either. It's, it's simply not relevant here. And with that, I'd like to take the rest of my time for rebuttal, if I can. Good morning, counsel. Good morning. May it please the court. Matt Berry on behalf of Churchill Downs. There's been no court in the nation that's held that free to play games like Big Fish Casino is illegal gambling. And it's not for lack of trying. Here plaintiff's counsel has filed these types of cases across the nation. And not only have they been universally rejected, in doing so, those courts made clear it's not even a close case. And the same is true here. Now at the outset, I'd like to address something that they've been arguing for. And that's that a liberal construction should apply here to these aspects of the Gambling Act. It's important to point out that there is a liberal construction clause in the Gambling Act, but it's very narrow and it does not apply here. That clause applies. You're saying that the liberal construction ought to be conservative? Absolutely. It's the rule of lenity and strict construction. Absolutely. Because it's a criminal statute and the liberal construction only applies to acts that are authorized by the Gambling Act. Games like bingo. Here, according to the plaintiff, we're dealing with acts that are not authorized by the Gambling Act. Therefore, you go back to the default rule. It's the rule of lenity and strict construction. But let me start with the language of the statute here. And the plaintiff focused on this thing of value definition. And I'll explain why the plaintiff is wrong on that. But the court need not even go there because it should start with the recovery of money lost at Gambling Act. And the plaintiff loses and the district court should be affirmed for a very simple reason. The plaintiff did not lose money. Now, if you look at exactly what she's alleging here in her claim, it's in paragraph 59. And she says that she lost, quote, money and she's seeking the recovery of the monies, quote, that she lost. She's not seeking in that operative paragraph, you know, a thing of value and to get back a thing of value, which makes sense. The thing of value here are the virtual chips. It's worthless. So focused on that exact paragraph, paragraph 59, she didn't lose money here. She bought chips knowing that they're virtual chips that could only be used in this game. And regardless of whether she was left with one chip or she had 10 billion chips, they're worthless. They can never come outside this game, never be. Unless, as the Bullseye case said, it allowed her the privilege of continuing to play. And if she's addicted, that may be worth a lot to her. Well, Bullseye is very distinguishable here. And in Bullseye, it's in the context of a game where you got points, but the whole goal was to get enough points so you can convert those points into cash or merchandise. The whole context of the Court of Appeals decision in Bullseye was that the purpose of the game was to accrue the points so you could transfer them into cash or merchandise. And the other important point about Bullseye is to look at the parties and the procedural posture. In Bullseye, you had the plaintiff file a declaratory judgment action against the gambling commission. Why? Because the gambling commission, in that case, had said they had deemed this game to be an That's very different here than what we have in our case, where the gambling commission has actually come out affirmatively, issued a pamphlet saying, free to play games, as long as you can't convert those chips back into real money, then it's completely legitimate. Do you contend that the pamphlet has any precedential value whatsoever from the gaming commission? Absolutely. So it's not precedential. Obviously, it's not going to bind this court. Right. But because there is this ambiguity that the court has noted, this gambling act, you know, was from the 1970s before there were iPhones, Androids, computers. And so when you try to interpret the statute, it's very helpful to look at the way that the governmental agency charged with enforcement interpretation of the statute. Where's the ambiguity? You said, so what's your argument? You argue the statute is ambiguous or you say it's a plain reading in the way you read it? So I just want to understand, what's your view of the statute? Is it a plain reading and the only interpretation is yours or there is ambiguity and why? We think there is an ambiguity and it's a latent ambiguity of trying to apply the thing And it's because if you look at the definition of thing of value, the last two words there without charge, which contemplates that everything coming before that costs money. And here, because we have a free to play game that 97% of the people who play it never pay money to play, then that's why we think that there could be a latent ambiguity. But it also doesn't matter because according to the rule of lenity and strict construction, if there are two reasonable interpretations of the statute, you have to find the one in favor of the, to do the narrow application here in favor of Churchill Downs. But we have bullseye and I know your effort to distinguish that, but it seems like the Washington Court of Appeals specifically held that the play credits, I'm trying to track the language here, that the play credits created a right to other credits that extended the privilege of playing the game without charge and therefore qualified as a thing of value. I guess, how can the court accept your position that the virtual chips here, which also extend the privilege of playing the game, are not things of value given this authority? The key word in that quote from bullseye is the game, because the game in bullseye was a game where you won cash and merchandise. That's very different here. It's like the Soto case in the Northern District of Illinois when it was construing California law. It said, yeah, of course in California, extended gameplay could be a thing of value, but it said only where the game costs money to play. It uses an example of a game that costs a quarter. If each time you lose a game, you have to put a quarter in to play it. The Soto case said, yes, of course, if you get free gameplay, you're not putting your quarter in and it's a thing of value, but what we have here is a game that is free to play and the vast majority never play it. Well, I can say, let's analyze that, Castle. If I go online and I start playing this and I want to continue to play, I've got to pay for it, right? Absolutely. You have a provision in your app so that people pay. If it's really a free game, why do you have that? Why don't you just put up a free game, no ability to pay whatsoever. What the ability to pay does, your honor, is it allows you to enhance your entertainment. I feel better already. It's the same thing as if you were playing a race car game and you could pay to upgrade from a Honda up to a Porsche. You get a little rush because you pay more. I'm sorry? You get a little rush because you can pay more? You get, because it gives you more chips and so it allows you more options in how you pay. I guess what I'm struggling with, you're saying, this is a free game. It's no problem. It's all different. But the reality is, if you want to play when your chips are gone, you've got to buy more. And you have an app that allows people to buy more and the money goes to Churchill Downs, which doesn't do it because it just wants people to have free games, right? No, your honor. That's not a correct characterization. And the reason why is when you run out of chips, you wait until you get more chips, which happens daily. And that's what 97% of... What if you can't wait? What if you can't wait? Well, then... You just want to play right now. I mean, you're so excited, the game just blows your mind. You want to play. You've got to pay for it, right? Unless you're going to cash in your chips. In that instance, you can enhance your entertainment by paying. If you can't wait for the next distribution within likely hours of free chips, then you have the option of paying. But the reality is, Churchill Downs doesn't do this for fun. It wants to make money, right? Of course. It's a business. It's a for-profit business. It's a business. It wants to make money. It isn't a free game. It wants to make money. It gets people going by giving them free chips. But that's what we're wrestling with here is under the statute, isn't the fact that people can continue to play by buying, doesn't it make it a thing of value because they want to continue to play? It doesn't, your honor. But it also doesn't matter. Courts like Mason v. Machine Zone assume that the game is illegal gambling and they say even though it is illegal gambling, if it is, you didn't lose anything of value here. Why not? Because you paid money to get chips knowing that you were going to take those chips and play a game with them. You didn't lose money. What you got is you purchased entertainment and you used that entertainment. Does the same apply to Bitcoin? I don't think so because Bitcoin is, you can take that and exchange it for value. Maybe it doesn't, but it's not a currency, so if people buy Bitcoin, they don't know what they're going to get. Is there any analogy here? It's completely different than Bitcoin. The reason it is is because you can take Bitcoin and exchange it for cash or merchandise. You can buy things with it. Apparently people can do that here illegally, contrary to the contract, but people are able to do that too, right? No, and the black market isn't relevant for a number of reasons. First, there's no allegation in the complaint that the plaintiff here ever attempted to go to the black market, ever sold the black market. Completely not relevant to the case. The second is what Judge Peckman relied upon, that the black market allegation contradicts the exact document she attached to her complaint, but let me give the court one more reason under the Recovery of Money Lost Gambling Act, why you don't even need to get to think of value. And that's because if you look closely at the language, it allows you to collect from the proprietor for whose benefit such a game was played. Here these gambling games were not played for the benefit of Churchill Downs. Churchill Downs has already made its money by the point that people buy their chips. This is the exact point that was made in Machine Zone and the Phillips case. Say that again? Churchill Downs made its money by people buying chips? If people make the option to enhance their entertainment by buying chips, Churchill Downs is done. It doesn't care if you play one game, play no games, because they're not going to lose or gain money. Well, but every time people buy chips, they make more money, right? So if they make some on day one, they make some on day two, they make some on day three, they're making money. That's true, but the language of the statute says that, it says, look at the game. And the game here is when they go on to play, say, an online casino, a slot machine. Churchill Downs does not benefit from the playing of that game, because regardless of whether the plaintiff wins a jackpot and gets 10 million chips in that game or not. I agree, but does that really matter in this case? Because Churchill Downs establishes the platform, which if people want to play more and their free chips are gone, it makes money. Now, I don't know whether your opposing counsel is correct. He claims that millions and millions of dollars are made by Churchill Downs in connection with this game. Would you agree with that, by the way? I would say, I'm not sure in the record of how much money was made, but definitely- Millions, all right. Yeah, millions of dollars are made. But the Machine's Own Court and the Phillips Court both say no money lost. Why? Because you didn't lose money playing the game. You've already taken your real money, converted it into some virtual currency, and then you get your entertainment by spending that virtual currency. There's also been a lot of discussion of, I guess let me make one point about Bullseye, too, is that in Bullseye, remember that the Gambling Commission had declared that game to be illegal gambling. Now, obviously, the Gambling Commission sees a distinction here because they say- No, the Gambling Commission never voted on anything. It's just a pamphlet, has no official, if you will, weight, no precedential value, right? I disagree. Even if it's not any deference given, it's still a body of knowledge by the governmental agency charged with interpreting- So, if some of our very able clerks in the court here were to write a book on how to win a case, would that bind the Ninth Circuit on how to win a case? Absolutely not, but that's not what happened here. What happened is four years ago, the Gambling Commission comes up with a pamphlet that it posts to its website for businesses and consumers to look at, and it's been posted to that website to this day, four years, and it has real-world implications. The plaintiff here is urging this panel to disregard and contradict the Gambling Commission. But for four years now, we've had businesses like Churchill Downs relying upon this guidance from the exact agency charged with enforcing the law, and they've complied exactly. There's no dispute about that. They comply with the guidance, and yet we have a plaintiff here who says, despite your compliance, no, it's actually illegal gambling and you owe millions. But in addition to the businesses, you also have consumers here who have very real-world implications of what the plaintiff is asking here. If the plaintiff is right, we don't think she is, but if she's right, this isn't illegal gambling, and in Washington, if you're playing, spending money at illegal gambling, it's called professional gambling in the third degree. It's a misdemeanor punished by up to a year in jail and $5,000. These implications are significant here. Now, the Gambling Commission, of course, is not binding on this court, but you have something they've posted to their website for the public, for the consumers, for the businesses to read for the last four years to rely upon, and just like the court said in Silver Streak, that was a policy memorandum. Okay, let me ask you this, because you're almost out of time. Would you argue your motion for why Churchill Downs should be substituted out for, let's say you want Big Fish Games to be substituted as the defendant? Yeah, absolutely. Big Fish Games is the company that develops this game, this application. If you look at the terms of use that the plaintiff attached to her complaint, it's a contract with Big Fish Games. If you look to the allegations in her complaint at paragraphs 10, 11, 22, and 70- Why don't you just add them as defendants rather than take yourself off, because they may not have any money. The plaintiff just said that they got- Big Fish Games have money? She said that the plaintiff here has said that they make millions and millions of dollars. It's not an issue about trying to collect from this entity. What you have here is Churchill Downs and the initial complaint was hanging by a thread. That thread is the mere fact that it owned 100% independent subsidiary, Big Fish Games. As of January of this year, that thread is gone. There's no dispute that Churchill Downs sold Big Fish Games, the subsidiary, to another company. How much did it sell it for? I think that it was $900 million, but I can't remember. Pretty good deal for something you don't make any money. Like I said, it's a for-profit business. Of course, they want to allow people to enhance their entertainment, but at the end of the day, there's no connection left. It's just like the Lucent v. Meyer case, where in that case, the interest, the AT&T sold the division to Lucent. The person had an employment discrimination case, and they allowed the substitution after trial on appeal. Now, why did you wait until now to seek the substitution? We still had that thread, Your Honor, of where Churchill Downs still owned at that time Big Fish Games. As of January 9th of last month, the sale was completed. You've done this within a month of the sale? We did it within days before the sale was completed, in anticipation that it would close, and between us filing our motion and the plaintiff filing her opposition, it closed. What did your sale documents say about this litigation? I'm not sure, Your Honor. Were you indemnifying them? I'm not sure. It's definitely not part of the record, and I personally don't know. You don't know? Did anybody in your office know? I'll bet they do. I'll bet they indemnified them. Your Honor, my law firm was not involved in the sale at all. Would it be fair to say that in a normal transaction, when you're selling a business, that if there's a pending lawsuit, that there's an indemnification, or at least taking into account what might happen? I'm not sure if that's fair or not. I just don't know here whether they're indemnified or not. Okay. All right. Any other questions about my colleague? Okay. Thank you, counsel. Thank you. I think opposing counsel has a little rebuttal time here. Yes, just a few brief points. To start, I'd like to correct a few things that were said about the record. There was repeated reference made to enhancing gameplay, and that comes from a line of cases that discusses things where you can play the game for free, but if you pay more, then you're more likely to win. In this game, if you run out of chips and you don't pay, it's not just that you can't play well. You can't play at all, right? So the chips do not enhance gameplay. They, in fact, are what allows you to play the game. If you don't have chips, you can't play. As far as the giving away chips every day, Churchill Downs has said this without citation to anything. It's not in the complaint. We allege that they give away 100,000 free chips, which sounds like a lot, but the chips are worth very little. That's like 10 spins of the wheel. They give that away at the beginning. There's no other allegations about any other free chips. Let me ask you this, counsel. If you are successful in this lawsuit, what do you get? What does that mean? What's the result? It's the net lost, right? So you don't get back the value of free trips. You don't get back the value of your top of what you managed to win. I'm talking about you. If you win this lawsuit, what's the result? The result is that the people who paid money for chips get back the value of the thing lost. That's what the statute is required. So you take over their whole time of playing, what is their net loss, and in reality, as we allege, you always lose everything. So in this case, if the reason it's a thing of value is because of the joy of continuing to play, that's what they want, and they don't get that back. So are they going to have their cake and eat it, too? Are they going to get the money back and they get to play more? The statute says that this kind of entertainment, and it may be entertaining, is illegal gambling, and to discourage it, yes, you get what you put in back. And so people will get... This is a class, then, for people just in Washington, or is it a much broader... There's a choice of law clause that chooses Washington law, so Washington law will apply to all of the people who play the game, and so they will all... Nationwide in its implications? Sorry? Is it nationwide in its implications? My understanding is that it is. I mean, we don't have specific allegations, but yes, and yes, so what they'll get, we think the best way to measure damages is what folks paid for it, but obviously, damages are ultimately a jury question. Okay. If there's no other questions, I'm out of... Just a question. No, those were some of my questions, because there's the reference made that the ramification or implications of this would constitute third-degree gambling. Is that your view? I mean, no, I don't know. I will say that in order to be convicted of a crime, you have to show mens rea, or you have to show that you intended to. I don't know what the required mens rea is for gambling. My guess would be that you wouldn't be able to show it here. My guess would also be that the... I mean, this is up to Washington prosecutors, but my guess is that this is not enforcement priority. I also just don't think that it's a relevant consideration here in order to discourage gambling. The Washington legislature passed this statute allowing people to recover money from proprietors, and that's the key point here. Are there other games that aren't big fish, but are similar to it that will be affected? There very well may be, and in fact, the Gambling Commission issued a cease and desist letter last year to one of these games, it's an Australian company called Valve, that was doing a very similar thing. They had these free to play games, you could buy these virtual items, and then people were gambling with them. And yeah, the Gambling Commission sent a cease and desist and said, hey, you have to knock this off. Now, was there any, now that you bring that point, any indication by the Gambling Commission, by cease or desist or otherwise, that this arrangement was illegal? With regard to this defendant specifically? Yes. The Gambling Commission hasn't commented with regard to this defendant. They appear misspelled in that PowerPoint presentation, presented by the employees, which I don't think has any weight, but there's been no ruling, or I don't think this has ever been before the Gambling Commission in the context of this defendant. All right. Thank you, counsel. Thank you. Thank you. To both counsel for your argument. We appreciate it. The case, okay. The court's going to take a two-minute recess, and then we will return to your argument in good luck.
judges: M. Smith, Murguia, Robreno